# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PINE INSTRUMENT COMPANY, AND ) 
PINE TEST EQUIPMENT, LLC, )
)
)
Plaintiffs, )
) Civil Action No. 14-94
) Judge Nora Barry Fischer
vs. )
)
CONTROLS USA, INC., AND )
GORDON BAKER, )
)
Defendants. )

## MEMORANDUM ORDER

Presently pending before the Court is Plaintiff Pine Instrument Company's ("Pine")

Amended Motion for a Preliminary Injunction against Defendants Gordon Baker ("Baker") and

Controls USA, Inc. ("Controls USA"), (Docket No. 14), and Controls USA's Oral Motion for

Expedited Discovery, (Docket No. 37). Following Pine's Amended Motion for a Preliminary

Injunction, (Docket No. 14), Baker's Response, (Docket No. 25), and Controls USA's Response,

(Docket No. 28), the Court convened an evidentiary hearing on February 19 and 24, 2014,

(Docket Nos. 33, 35). Upon consideration of all of the parties' filings on said Motions, the

evidence and the parties' arguments at the evidentiary hearing held on February 19 and 24, 2014

[33], [34], and for the reasons stated more fully herein, Controls USA's Oral Motion for

Expedited Discovery [37] is granted, and Pine's Amended Motion for a Preliminary Injunction

[14] shall be held in abeyance pending the results of the expedited discovery.[1]

---

[1] As a threshold issue, the Court recognizes that Controls USA filed a Motion to Dismiss for lack of personal jurisdiction, which was fully briefed as of March 21, 2014. (Docket Nos. 20, 21, 40). Although the Court does not rule on the Motion to Dismiss here, the Court notes that limited discovery can also be relevant in the context of evaluating personal jurisdiction. The Third Circuit has directed that "[a]lthough the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) and quoting *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir.1997)). "If a plaintiff presents

# I.     Background Information

Plaintiff Pine is a corporation organized under the laws of Pennsylvania, with a principal place of business in Grove City, Pennsylvania. (Docket No. 1 at 2). Pine describes itself as a "leading provider and producer of superpave and marshall asphalt testing equipment." (Docket No. 15 at 2). Pine also maintains that it "manufactures and sells electrochemistry research equipment and provides both design and contract electronic assembly services." *Id.* Pine asserts that it is an internationally-recognized leading provider of highly technical equipment and has developed and maintained valuable relationships with customers and vendors. *Id.* at 3.

Controls USA was apparently formed as a Georgia corporation on October 29, 2013.[2] (Docket No. 23 at 3). Yet, prior to its incorporation, it provided an offer of employment to Baker,[3] which he had accepted on October 23, 2013. (Docket No. 1-2 at 6). On November 4, 2013, Controls USA confirmed its offer of employment with Baker, acknowledging his October 23, 2013 acceptance, and setting forth that he would begin work in January 2014 and relocate from Pennsylvania to the Metro Atlanta Area. *Id.*

Baker had been an employee of Pine beginning in 1999. (Docket No. 15 at 3). Two days after his acceptance of his new position with Controls USA, Baker allegedly "sent at least six (6)

---

factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state,' the plaintiff's right to conduct jurisdictional discovery should be sustained. *Id.* (quoting *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)). "Where the plaintiff has made this required threshold showing, courts within this Circuit have sustained the right to conduct discovery before the district court dismisses for lack of personal jurisdiction." *Id.* at 456-57 ("Given the allegations as to Step Two's mimicry of Toys' ventures on the Internet and its copy-cat marketing efforts, it would be reasonable to allow more detailed discovery into Step Two's business plans for purchases, sales, and marketing. Limited discovery relating to these matters would shed light on the extent, if any, Step Two's business activity—including, but not limited to, its web site—were aimed towards the United States. This information, known only to Step Two, would speak to an essential element of the personal jurisdiction calculus."). Thus, limited discovery may be granted to determine whether Controls USA's business activity is aimed at the Western District of Pennsylvania. *See id.*

[2]     At the evidentiary hearing, Belena clarified that Controls USA is a wholly-owned subsidiary of Controls s.r.l., which is based in Milan, Italy. *See* Evidentiary Hearing Tr. 89:24-90:5 (Feb. 24, 2014). Controls s.r.l. and all of its subsidiaries are collectively known as the Controls Group. *Id.* 90:10-12.

[3]     Subsequently, during the evidentiary hearing, Baker confirmed that Controls USA had extended its offer of employment to him on October 8, 2013. *See* Evidentiary Hearing Tr. 35:8-12 (Feb. 19, 2014).

emails from his Pine corporate email account to his personal AOL email account," containing "highly confidential and proprietary information, including, but not limited to, internal drawings, parts lists, software instructions, pricing worksheets, [and] customer lists as well as service history and shipment logs." (Docket No. 15-1 at 4). On November 27, 2013, Baker sent another email to himself containing what appeared to be "Pine's highly confidential and proprietary information, Pine's list of contacts, internal Pine information, and Pine's research data." *Id.*

Thereafter, Baker apparently sent several more emails to himself on December 3, 4, 16, and 24, 2013 containing Pine's list of contacts, sensitive technical data, and pricing information. (Docket No. 15-1 at 17-23). Yet, Baker did not provide notice of his intent to terminate his employment with Pine until December 20, 2013. (Docket No. 15 at 6). Baker ostensibly continued to send emails to himself containing attachments of Pine's confidential and proprietary information through January 2, 2014, (Docket No. 15-1 at 24-26), even though his last day of employment with Pine was to be January 3, 2014, (Docket No. 1 at 8).

Several weeks later, on January 22, 2014, Pine filed the Complaint in this case. *Id.* Eight days later, Pine filed a Motion for a Temporary Restraining Order, (Docket No. 6), and a Motion for a Preliminary Injunction, (Docket No. 7), which this Court immediately denied, without prejudice, as Plaintiff's Motions were procedurally defective,[4] (Docket No. 9). On January 31, 2014, Controls USA sent a letter to Baker directing that he be suspended from work at Controls USA. (Docket No. 23-3 at 1). During his suspension, Baker was not to perform any activity on behalf of Controls USA and was relieved from any work-related obligation to relocate to the

---

[4] Section III.C of this Court's Practices and Procedures expressly provides that "in an injunction and/or temporary restraining order situation, the moving party must establish that serious efforts were made to contact the opposing party or its counsel prior to seeking relief, supported by the Fed. R. Civ. P. 65(b) affidavit regarding the same. Otherwise, the Court will not hold a hearing on the matter or issue a temporary restraining order." Rule 65(b) of the Federal Rules of Civil Procedure provides that "[t]he court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if (A) …; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b). Thus, the Court denied Plaintiff's Motions because Plaintiff did not file the necessary certifications. (Docket No. 9).

Atlanta area until further notice.  (Docket No. 23-3 at 1).  To that end, Baker has remained in Pennsylvania to date.  (Docket No. 21 at 3).

On February 7, 2014, Plaintiff filed an Amended Motion for a Preliminary Injunction. (Docket No 14).  Given the time frame with respect to the aforementioned emails sent by Baker to his personal email account, after his having accepted a position with Controls USA and prior to his last day at Pine, the Court ordered an evidentiary hearing to be held on February 19 and 24, 2014, (Docket Nos. 33, 35), so as to ensure that the data and any involved technology or electronic devices in the possession of Baker in this case would not be lost or discarded.  Upon consideration of the parties' filings, (Docket Nos. 14, 15, 23, 25, 41), and the testimony provided by the witnesses, (Docket Nos. 33, 35), the Court will grant Controls USA's Oral Motion for Expedited Discovery, (Docket No. 37), and hold in abeyance Pine's Amended Motion for a Preliminary Injunction, (Docket No. 14), pending the results of said discovery.

## II.     Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20, 23-24 ("[E]ven if plaintiffs have shown irreparable injury from the Navy's training exercises, any such injury is outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors. A proper consideration of these factors alone requires denial of the requested injunctive relief."); *see also Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010); *Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir. 2004).  "[I]f the moving party fails to

demonstrate either a likelihood of success or irreparable harm, the first two prongs, an injunction should not be granted." *IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc.*, 250 F. App'x 476, 479 (3d Cir. 2007); *see also In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982) ("Thus, a failure by the moving party to satisfy these prerequisites: that is, a failure to show a likelihood of success or a failure to demonstrate irreparable injury, must necessarily result in the denial of a preliminary injunction."). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987). To that end, "[t]he grant or denial of a preliminary injunction is committed to the sound discretion of the district judge, who must balance all of these factors in making a decision." *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982) (en banc).

Turning to the issue of trade secrets, "[u]nder Pennsylvania law, the prima facie elements of the tort of misappropriation of a trade secret are derived from the Restatement (First) of Torts § 757." *Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561, 566 (3d Cir. 2003). "Those elements are as follows: (1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff." *Id.* "Failure to establish any one of the elements defeats the claim." *Hill v. Best Med. Int'l, Inc.*, Civ. No. 07-1709, 2011 WL 5082208, *11 (W.D. Pa. Oct. 25, 2011). The Pennsylvania Uniform Trade Secrets Act provides several definitions in the context of the misappropriation of trade secrets. *See* 12 PA. CONS. STAT. § 5302. A trade secret is "[i]nformation, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by

proper means by, other persons who can obtain economic value from its disclosure or use. (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* "Factors relevant to determining whether information is a trade secret include the extent to which it is known outside the owner's business; the extent to which it is known by employees and others within the owner's business; the extent of measures taken to guard the secrecy of the information; the value of the information to competitors; the effort or money expended to develop the information; and the ease or difficulty with which it could be properly acquired or duplicated." *Nova Chemicals, Inc. v. Sekisui Plastics Co.*, 579 F.3d 319, 327 (3d Cir. 2009).

Placing these factors in context, the Third Circuit has held that the likelihood of success on the merits for a claim of trade secret misappropriation is a highly fact-specific inquiry:

> [T]he relevant Pennsylvania decisions, viewed as a group, suggest that (1) a determination of whether to grant injunctive relief in a trade secrets case and, if so, the proper scope of the relief, depends on a highly fact-specific inquiry into the situation in the case the court is considering and (2) a court conducting this inquiry has discretion to enjoin a defendant from beginning new employment if the facts of the case demonstrate a substantial threat of trade secret misappropriation.

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 113, 118 (3d Cir. 2010) (holding that "the District Court did not abuse its discretion by determining that Bimbo demonstrated a likelihood of success on its misappropriation of trade secrets claim."). As for irreparable harm, suspicious employee conduct during the final weeks of employment can weigh in favor of a preliminary injunction. *Id.* at 118 ("Nevertheless, at this preliminary stage of the proceedings, the District Court did not abuse its discretion when, faced with evidence of Botticella's suspicious conduct during his final weeks at Bimbo, it determined that a stronger remedy was needed in the interim to protect Bimbo from imminent irreparable harm."). Turning to the balance of hardships, "a temporary injunction prohibiting someone from pursuing his livelihood in the manner he chooses

operates as a severe restriction on him that a court should not impose lightly." *Id.* at 119. "Nevertheless, such a temporary restriction on his employment is warranted where, as here, the facts demonstrate that the restriction is necessary to prevent greater irreparable harm from befalling another party." *Id.* Last, with respect to the public interest, the right of an employee to be free to work for whom they please is an important public interest. *Id.* (citing *Renee Beauty Salons, Inc. v. Blose–Venable*, 652 A.2d 1345, 1347 (Pa. Super. Ct. 1995)). However, the facts and circumstances of each individual case can demonstrate that "the public interest in preventing the misappropriation of [plaintiff's] trade secrets outweighs the temporary restriction on [defendant's] choice of employment." *Id.*

In light of the foregoing factors, and the suspicious series of emails that Baker had sent to himself, the Court now turns to the evidence presented at the hearing on February 19 and 24, 2014 to determine whether to grant Pine's Amended Motion for a Preliminary Injunction. (Docket Nos. 33, 35).

## III.    Factual Findings

During the hearing, the Court heard testimony from Baker on cross-examination, Ralph DiLuigi ("DiLuigi"), Greg Cancilla ("Cancilla"), and Joseph D. Hines ("Hines") on behalf of Pine. (Docket Nos. 33, 35). Testimony from Alvaro Belena ("Belena") on behalf of Controls USA was also secured, but Controls USA did not produce Flavio Galli ("Galli"), Ivan Varlamoff ("Varlamoff"), Ken Mackey ("Mackey"), or Kelly Ware ("Ware"), even though the Court notified all parties that affidavits would not be sufficient and in-person testimony was necessary. (Docket No. 33, 35). Following the witness testimony, the Court admitted several exhibits in evidence, including Pine Exhibits 1-5, 6A, and 7-15, *see* Evidentiary Hearing Tr. 49:9-21 (Feb.

24, 2014), and Controls USA Exhibits 1-4, *see id.* 150:15-20.  The Court now sets forth its factual findings concerning each witness, and the Exhibits admitted in evidence, in turn.

### A.  Factual Findings Concerning Mr. Gordon Baker

- Baker was fairly articulate, but not entirely credible as a witness.
- He has a Bachelor's Degree in International Business Administration.  *See* Evidentiary Hearing Tr. 106:5-15 (Feb. 19, 2014).
- He is amenable to third party evaluation of his personal computer, flip phone, personal AOL email account, and smartphone.  *Id.* 6:14-9:7.
- He is currently suspended with pay, by Controls USA.  *Id.* 15:11-18.  He was previously employed by Pine beginning in June 1999. *Id.* 18:12-16.  His responsibilities at Pine were sales and customer service, and he occasionally dealt with suppliers.  *Id.* 18:17-21, 42:14-16.  He received an employee handbook and signed an acknowledgement.  *Id.* 18:22-25.
- He knew that there were obligations of confidentiality with respect to information that Pine owned and utilized.  *Id.* 20:17-20.  The confidentiality statement required Baker not to take or use Pine information for any personal benefit.  *Id.* 21:23-22:2.  This statement was part of the employee handbook, which was in effect in 2013.  *Id.* 22:3-10.  Baker was neither given a non-compete nor a non-disclosure agreement. *Id.* 98:12-18.  He attended an employee meeting on October 22, 2013 regarding the employee handbook, and signed the sign-in sheet for same.  *Id.* 23:5-24:9.
- Baker had been in contact with Galli of Controls s.r.l., based in Milan, Italy, in August 2012.  *Id.* 25:10-12, 27:5-21.  He had been seeking a new job since 2006.  *Id.* 25:13-25.  Baker recognized that Pine and Controls s.r.l. were competitors with respect to the gyratory compactor.  *Id.* 25:3-9.
- In November 2012, Baker met with Galli, Belena, and Mackey in Cleveland, Ohio.  *Id.* 26:11-18.  Baker did not know the precise positions or roles of these people within Controls USA at the time, but he now understands that Galli is the current President and CEO of Controls USA.  *Id.* 26:19-27:19.  Mackey is a consultant who does market analysis and market research in the test equipment market.  *Id.* 28:13-29:4.  Baker also understood that Controls USA had not yet formed as of November, 2012.  *Id.* 29:5-8.
- Baker met with Belena again in February 2013 at the Marriott Hotel in Pittsburgh, PA.  *Id.* 29:16-18.  Belena had been in the United States to meet with Applied Test Systems ("ATS") concerning a bending beam rheometer ("BBR").  *Id.* 30:14-31:24.
- Every few months thereafter, Baker sent an email to the people within the Controls Group to refresh his proposal to work with them, including in June 2013.  *Id.* 33:1-34:18.  On October 8, 2013, Controls USA sent an employment offer to Baker.  *Id.* 35:8-12.  Baker, Galli, and Varlamoff met in person, in November 2013, in Atlanta.  *Id.* 34:19-35:7.  Varlamoff is a consultant to Controls USA.  *Id.* 73:5-74:7.
- On October 23, 2013, Baker accepted the employment offer, *id.* 36:10-13, but he had not yet told Pine at that time, *id.* 39:2-4.  His proposed position with Controls USA would be a procurement and customer care manager.  *Id.* 39:24-40:1.  According to Baker, one of his goals in procurement would be to procure BBR, as Controls USA at that time had not yet been able to secure an agreement to sell BBR.  *Id.* 36:24-27:6.  Baker denied discussing the Superpave Gyratory Compactor prior to October 23, 2013.  *Id.* 37:13-25.

- Yet, Baker knew that both the Controls Group and Pine sell gyratory compactors, and he stated that he was only looking to service Controls Group equipment. *Id.* 42:11-13.
- As for his Pine work email, Baker denied knowledge of a VPN in general and how to access work email remotely through Pine webmail. *Id.* 46:11-47:8. He also denied being provided a user name and password to remotely access Pine work e-mail. *Id.* 47:2-5.
- Baker maintains that he sent emails to his personal AOL account as part of the web design project, and that he worked on this project until his last day at Pine. *Id.* 47:19-49:5. He has accessed his personal AOL account from a public or shared computer. *Id.* 52:9-11. He has also accessed his account with a smart phone. *Id.* 53:9-10. He sent numerous emails to his AOL account, but he maintains that this activity was consistent with his activity at Pine prior to accepting a position with Controls USA. *Id.* 53:14-56:1.
- Baker worked on pricing at Pine and denied disclosing any such information to Controls USA or to Belena. *Id.* 50:24-52:2.
- Pine has sold a variety of gyratory compactors, including a G2, G2AS,[5] G1 and 125X. *Id.* 65:8-25. Pine continues to service these gyratory compactors. *Id.* 66:1-3.
- Baker sent to his personal AOL email account a document that lists every component necessary to assemble a Rapid Angle Measurement ("RAM") Kit, *id.* 66:6-71:17, which is proprietary to Pine, *id.* 71:18-25. Baker agreed that a person with this document could manufacture Pine's RAM Kit from scratch. *Id.* 72:3-8. He also admitted that the Pine Instrument Company (PICAM) Bill of Material-GC Rapid Angle Measurement Kit was a proprietary trade secret. *Id.* 72:19-73:4. Most of the emails that he sent to his personal AOL email account relate to gyratory compactors, which are Pine's main products. *Id.* 75:2-8. He conceded that without those products, Pine would not survive. *Id.* 75:9.
- Shortly after the November 2013 meeting, Baker emailed himself a spreadsheet identifying the phone numbers, emails, and addresses of all of Pine's customers and contacts. *Id.* 76:3-19. He agreed that this information was a confidential trade secret and proprietary, and had been formatted for printing on a label or mass mailing. *Id.* 77:8-23.
- Baker also sent himself an email dated December 3, 2013 containing an attachment, "printer.xls," which appeared to contain highly technical Pine design information. *Id.* 77:24-78:15. A December 4, 2013 email also contained all of Pine's customer information, *id.* 78:18-20, and NCAT Asphalt Content Ignition 2014 Pricing, *id.* 79:6-18.
- On January 2, 2014, Baker sent himself another email containing a Distributor Profile, which is a document that prospective distributors or agents must complete in order to be considered by Pine for carrying Pine products. *Id.* 80:3-21. He maintained that this information was necessary for the website on which he was working. *Id.* 80:20-25.
- Baker gave Pine notice that he would be leaving Pine on December 20, 2013, but he did not disclose the identity of his new employer. *Id.* 81:10-21.
- Baker attended a World of Concrete trade show in Las Vegas, at which Controls USA had a booth. *Id.* 81:25-82:4. At the booth, Baker handed out fliers, consisting of a mass-mailer designed by Varlamoff, the consultant.[6] *Id.* 82:5-83:13. Baker denied opening the

---

[5]     Baker's testimony on the four types of gyratory compactors that Pine offers is inconsistent with that of Hines, who testified that the fourth type was named GB. *See* Evidentiary Hearing Tr. 119:2-20 (Feb. 19, 2014).

[6]     Baker denies sending any email to Varlamoff concerning Pine's mailing labels and contact list, but Controls USA did not produce Varlamoff for cross examination, which the Court found to be insufficient, as this Court discusses further in § IV, *infra*. (Docket No. 35).

email containing Pine's mailing labels, and asserted that he could not use the labels, if he did not open them. *Id.* 83:15-18, 84:5-17.

- These emails were Pine property, and Baker did not delete them. *Id.* 85:7-22, 86:13-23.
- Baker maintained that he worked from home as often as possible, and on evenings, weekends, and holidays as time permitted. *Id.* 87:12-17. He worked on Pine's website for more than four months, asserting that overtime work was necessary. *Id.* 89:25-91:14. Baker averred that Dave Savage ("Savage") and Todd Arnold ("Arnold"), his supervisors, knew that he was working from home. *Id.* 91:15-19.
- Pine held a training session about the website development, which was attended by Baker, DiLuigi, Colin Bookliner ("Bookliner"), and Jeremy Delatri ("Delatri"). *Id.* 92:12-93:4. It consisted of an introduction to the web tools. *Id.*
- Baker explained that the 900 megabytes of data that he uploaded to a cloud server contained photographs. *Id.* 93:5-94:18.
- He denied providing any information to the Controls Group. *Id.* 94:23-25. He also denied that anyone from the Controls Group ever asked him to provide Pine information. *Id.* 94:19-22, 99:24-100:14. He has not accessed his Controls USA email. *Id.* 104:9-12.
- Baker averred that Controls sells products other than gyratory compactors. *Id.* 95:1-97:3.
- Baker further affirmed that he was never asked to return any property to Pine, and he worked up until the day he left Pine. *Id.* 98:12-99:3.
- Robin Vaughn conducted an exit interview with Baker. *Id.* 107:15-16. She did not tell him to return any Pine property. *Id.* 107:19-25. When Baker gave his notice to Savage, Savage did not tell him to return any Pine property. *Id.* 108:23-109:9.
- Baker also maintained that he was dealing with several personal issues during the summer and fall of 2013. *Id.* 100:22-103:7.

### B. Factual Findings Concerning Mr. Ralph DiLuigi

- DiLuigi was an articulate and credible witness.
- He is the director of Information Technology ("IT") Services at Pine Instrument Company, with 30 years of experience. *Id.* 113:19-114:5. He oversees security. *Id.* 116:13-15. Everyone has a username and password. *Id.* 116:18-20. Access is controlled by job function and business group. *Id.* 117:11-13. He monitors flows. *Id.* 118:1-8. His analysis revealed that Baker's activity spiked in December 2013. *Id.* 128:20-25.
- Pine makes available a VPN. *Id.* 121:15-17. Baker never informed DiLuigi that he was having trouble with the VPN. *Id.* 122:13-15. DiLuigi was not aware of Baker having any problem with external access to Pine email. *Id.* 122:19-21.
- DiLuigi participated in meetings on the website project, in which Baker was the lead. *Id.* 124:14-125:1. DiLuigi did not believe that Baker needed to work on off-hours. *Id.* 125:2-10. At least two meetings were devoted to freeing up time to work on the website project. *Id.* 125:2-10. Bookliner assisted Baker, yet DiLuigi did not know of Baker's apparent requests for help. *Id.* 125:11-126:6.
- DiLuigi averred that customer service history, contact lists, certificates of calibration, and drawings were <u>not</u> intended to be uploaded to the website. *Id.* 126:7-17.
- The deadline for the website project was January 1, 2014. *Id.* 127:2-19.
- DiLuigi cannot determine the destination of emails, only their volume. *Id.* 129:15-130:1.

### C.    Factual Findings Concerning Mr. Greg Cancilla

- Cancilla was an articulate and credible witness.  He was proffered by Pine to testify concerning a proposed forensic evaluation protocol for Baker and Controls USA's electronic devices and email accounts.
- Items can be deleted from an AOL email account by using a public PC.  *See* Evidentiary Hearing Tr. 9:2-8 (Feb. 24, 2014).  The typical practice is to use an initial set of documents containing the trade secrets in creating a hash set, which is a set of digital fingerprints, and to compare the hash set to the digital fingerprints on other devices.  *Id.* 9:14-23.  This is called a hash comparison.  *Id.* 9:23-25.  The search can be performed on PST files, which are mail containers containing an email and its attachments.  *Id.* 10:1-9.  Similar files can be created for other e-mail systems, such as Lotus Notes.  *Id.* 9:10-15.
- In a hypothetical search of an e-mail with five attachments, for instance, in which one attachment is a hit, and the rest are not, the protocol could provide for a privilege log, in which non-responsive documents are removed prior to producing the search results.  *Id.* 11:17-12-3.  There is no risk of identifying non-responsive documents or ones other than the initial set of documents.  *Id.* 11:7-16.  Cancilla has executed these searches previously within the context of confidentiality orders in federal court.  *Id.* 12:5-7.
- Under a POP3 server-based system, the POP3 protocol pulls emails from the server and stores them on a local computer.  *Id.* 12:15-13:3.  A hash value search can still be done, but instead of doing the analysis on the server, it would be done on the local computer; otherwise, the analysis is the same.  *Id.* 13:4-10.  The risk of identifying non-responsive documents is no different from that in searching server-based systems.  *Id.* 13:11-14.
- The hash value comparison is the typical standard practice for beginning a search, but it is not exhaustive.  *Id.* 13:15-20.  The hash value search does not account for printed copies of documents or copies of documents transferred via a jump drive.  *Id.* 13:15-25.
- In the POP3 server environment, the hash value search would need to be executed on each individual selected user's PST file to obtain the results.  *Id.* 14:8-13.

### D.    Factual Findings Concerning Mr. Joseph D. Hines

- Hines provided articulate and credible testimony.
- Hines is the President of Pine, and received his business administration degree from Mercyhurst College.  *Id.* 15:14-15.  He also has associate degrees in purchasing management and production management.  *Id.* 15:15-16.
- Pine has been in business since 1962.  *Id.* 16:18-19.  Pine is a manufacturing company based in Grove City, PA, with about 105 employees.  *Id.* 15:18-19, 16:8-9, 16:14-15.  Pine also has an office in Durham, NC, for development and sales of electrochemistry equipment.  *Id.* 16:8-11.  Fifty employees perform manufacturing duties of assembling electronic and electromechanical controls and machinery.  *Id.* 15:19-21.  The other 50 employees perform support functions, including sales and marketing.  *Id.* 15:21-23.
- Pine works in three primary markets: (1) providing controls to original equipment manufacturers for their equipment, (2) producing equipment in Pine's name for the electrochemical testing industry, and (3) producing equipment in Pine's name for the asphalt testing industry.  *Id.* 15:24-16:3.

- Pine Test Equipment, LLC ("Pine Test Equipment") is a division that is responsible for the development, sales and marketing, and service of asphalt testing equipment. *Id.* 16:4-7. Pine Test Equipment is located in Grove City, PA. *Id.* 16:12-13.
- Turning to the Superpave Gyratory Compactors, Superpave refers to a method developed by the Federal Highway Administration for asphalt technicians to produce samples in a lab for testing as they are being produced by an asphalt producer. *Id.* 17:2-19.
- Pine maintains confidential information and trade secrets related to the design of its products, the set-up and testing of its products, its customer lists, and the service history of its products. *Id.* 18:13-20.
- Pine currently sells two models of gyratory compactors, the GB and G2, but it also services and maintains its older models, the 125X and G1. *Id.* 19:2-20. Annual sales revenue for gyratory compactors, i.e., the GB and G2, is about $4 million, and revenue from servicing the 125X and G1 is about $600,000. *Id.* 19:15-20.
- Prior to 2014, Hines was unaware of any presence in North America of the Controls Group. *Id.* 19:21-24. Specifically, Pine participates in state-wide bids for asphalt products and services. *Id.* 19:25-20:2. The names of other bidders are disclosed when the bid is opened, and Hines has not been aware of the Controls Group or Controls USA being identified in any of the previous bids that Pine has submitted. *Id.* 20:4-11. Pine submits fewer than six bids per year. *Id.* 20:12-14.
- Turning now to Baker, Hines testified that Baker worked for Pine and Pine Test Equipment in the sales, service, and customer service divisions. *Id.* 17:20-18:2.
- Pine employed Baker for about 14 years as a trusted employee. *Id.* 20:15-18. Baker had access to design information for products, production information, customer lists, and the cost and service history because they were necessary for him to perform his job. *Id.* 20:19-21:3. Pine relied on Baker to maintain confidentiality because disclosure of design information to competitors would cripple Pine's ability to compete. *Id.* 21:8-13.
- Hines first learned that Baker was leaving Pine on December 20, 2013, though Baker had already known that he would be departing. *Id.* 21:14-24. Hines was disappointed that Baker did not inform Pine of his expected departure, and first learned that Baker would be working for a competitor on January 10, 2014, <u>after</u> his departure. *Id.* 21:25-22:9.
- Had Pine known of Baker's expected departure, Pine would not have invested in training Baker concerning the tools necessary to develop the website. *Id.* 22:17-23:4. Baker was also helping to establish 2014 prices for service items, and had Pine known that Baker would be leaving, Pine would have directed that Baker train a replacement. *Id.* 23:5-10.
- Hines personally reviewed Baker's emails from his Pine account; he observed numerous emails sent to Baker's personal AOL email account containing highly confidential and proprietary information. *Id.* 23:15-24:5. Hines considered this email activity to be out of the ordinary, beginning on October 25, 2013. *Id.* 24:9-14.
- More specifically, from June through October 24, 2013, Baker sent himself 11 emails, none of which contained attachments, and all of which were links to tools necessary to work on the new website. *Id.* 24:18-22. However, after October 25, 2013, the emails contained attachments of confidential and proprietary information. *Id.* 24:23-25:1.
- Turning to Pine Exhibit 7, Hines identified the letter designations that correspond to the names of attachments to emails that Baker sent to himself. *Id.* 28:2-29:9. He explained that the third and fourth characters identify the specific gyratory compactor, and that GC corresponds to the 125X model. *Id.* These documents allow Pine's help desk to assist

the owners of Pine equipment if they should choose to complete a repair on their own. *Id.* 29:10-20. The help desk allows Pine to provide the best possible customer service for the owners, and the documents are not shared with the general public. *Id.*

- Pine Exhibit 7 § 15(j) is the RAM Kit, which is technology subject to patent protection; Pine acquired the rights to use the technology and develop the RAM Kit, and made enhancements to the use of same, for which Pine received a patent. *Id.* 29:23-30:22. The attachment contained an exploded drawing of the RAM Kit showing how to assemble it and all of its components, for which Pine undertook efforts to protect. *Id.* 30:23-31:3. Based on this information, a competitor could construct the RAM Kit. *Id.* 31:4-7.

- Pine Exhibit 7 § 16(i) is a 125X gyratory compactor, and Pine Exhibit 7 § 16(m) is a G1 gyratory compactor. *Id.* 31:12-17. Pine Exhibit 7 § 16(v) is an attachment, titled "Brovold Button Up Procedures," which refers to the GB gyratory compactor, and is protected by patents. *Id.* 31:24-32:7. The content of Brovold Button Up Procedures is a final checkout procedure for the gyratory compactor before it is shipped to a customer, and includes specific information about the calibration and the recording of all pertinent data on the machine before it leaves Pine. *Id.* 32:8-16. Pine protects this information as proprietary, confidential, and/or trade secret. *Id.* 32:8-21.

- Pine Exhibit 7 § 16(ddd) is the "Pine Instrument Company Gyratory Compactor Mechanical Assembly," which contains a list of all the parts for the G2 gyratory compactor, and a competitor could utilize this information to understand how the G2 is put together to enhance its products. *Id.* 32:24-33:16. Pine Exhibits 7 § 16(fff) through (mmm) are detailed drawings used by Pine's production team to build subcomponents for the G2 gyratory compactor, which Pine considers to be a trade secret. *Id.* 33:17-25.

- None of the aforementioned documents would ever be uploaded to Pine's website, and Hines cannot think of any reason for Baker to send this information from his corporate email account to his personal AOL email account. *Id.* 34:1-9.

- Pine Exhibits 11, 12, and 13, admitted in evidence under seal, are a collection of documents used in production for the assembly of the G2 gyratory compactor, a bill of materials of all the components used throughout all levels of assembly of the RAM Kit, and an exploded drawing of the assembly process containing all the components necessary for making a RAM Kit. *Id.* 34:21-38:17. Hines considers all this information to be confidential trade secrets and proprietary. *Id.* He reiterated that he would never consider uploading the same to Pine's website, and he could not think of any business-related reason for Baker to email this information to his personal AOL email account. *Id.*

- Pine Exhibit 7 § 20(mmm) contains a list of every gyratory compactor that Pine has ever sold, and every help desk ticket created for the same, which Pine has maintained since May 1994. *Id.* 38:18-39:10. It contains approximately 14,000 lines, and additional details such as contact names and particular issues with particular products. *Id.* 39:2-19.

- Pine Exhibit 14 is a Rule 1006 summary of the email attachments corresponding to Pine Exhibit 7 § 20(mmm). *Id.* 40:8-19. This information would never be uploaded to the Pine website, but it could be related to the pricing of parts included on a service order. *Id.* 40:20-25. However, Hines could not think of any business-related reason for Baker to send this information to his personal AOL email account, and it could be obtained elsewhere. *Id.* 41:1-14.

- Pine Exhibit 15, admitted under seal as "attorney eyes only," contains all of the contact information out of Pine's organizational database, which Pine has maintained since the

late 1960s.[7] *Id.* 43:15-25. Pine protects the contact names because many of the contacts are technicians within a lab such that their contact information is not easily accessible. *Id.* 44:25-45:8. Pine created this list over 40 years. *Id.* 44:9-13. Pine would never contemplate uploading this information to its website. *Id.* 44:17-45:6. A competitor could use this information to identify the purchasing department or the manager at a facility. *Id.* These contacts were gathered as customers contact Pine to request an annual calibration or other assistance. *Id.* 45:1-6. Hines could not think of any business-related reason for Baker to email this information to his personal AOL email account. *Id.* 45:7-10. Yet, Pine Exhibit 7 § 18 indicates that Baker did so. *Id.* 45:11-14.

- Pine Exhibit 7 § 24 describes an email with the subject line "Printer and Data Logger Info?" This email contains a spreadsheet developed by the Pine engineer who was the head of a project to design a communications module that would allow all of Pine's gyratory compactors to communicate with a USB stick or modem printer. *Id.* 45:15-46:10. The spreadsheet details how to accomplish the task of bringing each of the gyratory compactor models up to date from the engineer's perspective. *Id.*

- Hines trusted Baker and believed that Baker would return any Pine property. *Id.* 47:18-23. But, Baker had not complied with that obligation (as of this hearing). *Id.* 47:24-48:3. Pine did not question Baker about whether he had any proprietary information because it trusted that he would return anything that he had in his possession. *Id.* 48:4-13. At the time, Hines had no idea Baker had sent the emails listed in Pine Exhibit 7. *Id.* 48:14-16.

- The impact of allowing this information to remain outside of Pine's control would be very detrimental to Pine's ability to compete in the marketplace. *Id.* 48:17-24.

- On cross examination by counsel for Baker, Hines agreed that Pine possesses a lot of confidential and proprietary information that is important to Pine's business. *Id.* 50:5-14. Pine's field is competitive, and it is important to have good products and good employees and to protect all of the company's assets. *Id.* 50:15-51:9. Hines has known this for a long period of time, he has had access to legal help, and he has known that there are ways to protect information. *Id.* 51:24-52:11. Hines agreed that it is important to do all that is reasonably necessary to protect Pine's information. *Id.* 52:18-20.

- Yet, Pine did not ask Baker to sign a non-compete or a confidentiality and nondisclosure agreement.[8] *Id.* 52:21-53:20. Pine did not require Baker to sign any agreement to give

---

[7]      Although the parties may dispute whether the lists of suppliers or distributors qualify as trade secrets, *see* Motion Hearing Tr. 80:24-81:24 (Feb. 24, 2014), the Third Circuit has noted that a preliminary injunction can be narrowly tailored to preclude unfair competition when a defendant uses a plaintiff's own confidential information to compete against the plaintiff. *See Doebler's Pennsylvania Hybrids, Inc. v. Doebler Seeds, LLC*, 88 F. App'x 520, 523 (3d Cir. 2004) ("The new TAS employees have made use of their contact lists developed at DPH and TAS marketing staff have made direct comparisons between their products and those of DPH, including telling customers that 'basically the same people that produced [DPH] hybrids ... will now be producing [TAS] hybrids.'").

[8]      To the extent that Controls USA maintains that Pine's allegations fail because Baker did not sign a non-compete agreement, the Court does not find the absence of a non-compete agreement to be dispositive. *See Doebler's Pennsylvania Hybrids, Inc.*, 88 F. App'x at 523 ("Appellants' argument that no non-compete agreements were signed is irrelevant. Appellants' liability is not premised on the fact that they competed with DPH, but rather on the fact that they used DPH's own confidential information to compete against them."). However, the Court is mindful that Pine could have taken several other steps to protect its confidential information. These include reminding employees of the obligation to keep trade secrets and other proprietary information confidential, keeping trade secret information under lock and key, restricting trade secret information to those with a legitimate need-to-know, conspicuously marking trade secret information as "proprietary" and/or "confidential," prohibiting unauthorized use or disclosure of the information, monitoring the copying of software and documents, remaining

back any type of confidential information. *Id.* 53:21-54:6. Baker was an at-will employee, as was specifically stated in the employee handbook that Baker signed. *Id.* 54:7-20. Nothing in the employee handbook required Baker to tell Pine who his new employer would be, that he had accepted new employment, when he intended to start, or for whom he intended to work. *Id.* 54:23-55:13. Baker did not violate any written obligation when he gave Pine his two-week notice. *Id.* 55:14-17.

- Baker was a salaried employee who was expected to complete assignments on time. *Id.* 56:1-20. Employees could reasonably work overtime. *Id.* 56:21-24. Hines knew Baker for 14 years, and Baker had a good work ethic and wanted to accomplish his work for his co-workers. *Id.* 56:25-57:9. However, Hines did not know that Baker had worked from home. *Id.* 57:10-15. Working at home was permitted but not encouraged. *Id.* 57:16-20.

- The culture at Pine is distinctive; it balances work and life, with the higher attendant costs, because Pine owns a manufacturing facility in which workers work only one shift, and there is no expectation placed upon employees that they work from home, though they do have access to VPN and email from home. *Id.* 58:2-16.

- As Pine's products are priced higher than their "competitors'," one way a competitor can compete with Pine is to offer lower prices on the competing products. *Id.* 58:24-59:6.

- Pine's company information can be accessed through a VPN or through web access via the Pine email account. *Id.* 59:21-60:3. Employees have the ability to email information from the company email system to their personal email accounts. *Id.* 60:12-20.

- Turning to Baker's two-week notice to Pine, Hines stated that Baker disclosed that he would be moving to a position in procurement and customer relations. *Id.* 61:8-19. Baker did not tell Hines whether he would or would not be working for a competitor. *Id.* 62:15-18. Hines had some curiosity as to where he would go, but not a lot, and trusted that Baker would inform Hines if his new position was pertinent to Pine's business. *Id.* 62:2-63:5. Hines was aware that Baker could be moving to a competitor. *Id.* 63:7-11.

- Yet, no one asked Baker if he had any proprietary, confidential, or trade secret information belonging to Pine within the two-week period after he had given Pine his notice. *Id.* 63:12-17. The human resources letter acknowledging Baker's last day did not request the return of any of Pine's confidential information. *Id.* 63:18-64:3.

- When Hines became aware of the nature of the information that Baker had emailed to his personal AOL email account, Hines did not contact Baker to arrange for the return of the Pine information. *Id.* 64:4-23. Rather, Hines felt he had to act. *Id.* 64:10-16.

- From June 2013 through October 24, 2013, Baker sent 11 emails from his Pine work email to his personal AOL email account, which contained links, but no attachments. *Id.* 66:2-5. From January 1 through June, 2013, there were no emails. *Id.* 66:11-17.

- Hines agreed that Pine Exhibit 15, a binder 4-5 inches thick containing the contact list and phone list of Pine's contacts, could not be committed to memory. *Id.* 66:18-67:16.

- On cross examination by counsel for Controls USA, Hines disclosed that on January 10, 2014, he requested access to Baker's Pine email account from DiLuigi after Baker's supervisor expressed some concern regarding where Baker may have gone to work. *Id.* 68:15-20. When Hines requested access to Baker's email account, DiLuigi informed

---

vigilant and aware of any signs that employees may be misusing trade secrets, conducting exit interviews to remind former employees to return all trade secret and proprietary information belonging to the company, and checking departing employees' computers for recently downloaded, copied or emailed information. *See Identifying and Protecting Employers' Interests in Trade Secrets and Proprietary Information*, 68 DEF. COUNS. J. 439, 448 (2001).

Hines of the spike in the data stream associated with Baker's email account. *Id.* 69:3-20. DiLuigi had preserved a maintenance log, which reviewed all activity across all computers within Pine, and shared that log with Hines. *Id.* 69:24-70:12. Hines also personally reviewed all of Baker's emails. *Id.* 69:21-23. No other information or analysis of Baker's activity from his Pine computer was done. *Id.* 70:10-12.

- Baker sent his emails to a single AOL account belonging to and controlled by him. *Id.* 70:13-22. Hines has no evidence that Controls USA had access to Baker's AOL email account or ever saw or used the information in the account. *Id.* 71:13-72:10. Hines also has no evidence that any of the information was transmitted to anyone other than Baker. *Id.* 72:11-14. Hines could not confirm whether Baker opened any of the emails, as Hines did not have access to the AOL email account. *Id.* 72:15-21.

- Hines believes that Controls USA is a competitor because it makes a gyratory compactor. *Id.* 73:5-15. But, Hines admitted that Controls USA has not yet sold same in the United States, nor was the Controls Group involved in any past bid situations. *Id.* 73:16-74:7.

- Hines also admitted that he has no information as to whether Controls USA uses a different technology or approach from Pine's gyratory compactors, or whether Pine's information or technology would be of any use to Controls USA in making or refining Controls USA's gyratory compactor. *Id.* 74:8-17. Pine's gyratory compactors use the electromechanical and hydraulic approaches, which are different from the pneumatic approach. *Id.* 74:18-25. Pine does not make gyratory compactors using the pneumatic process. *Id.* 75:11-12. There are pros and cons to each process, but there are no significant differences in the performance of each machine. *Id.* 75:16-23.

- Pine purchases a license for some of the technology behind its gyratory compactors. *Id.* 76:6-7. Pine licenses the RAM technology from a Finnish company, which permits Pine to manufacture and sell products using that technology in the United States and Canada only. *Id.* 76:8-77:10. Pine has sold the gyratory compactor on two occasions outside of the United States and Canada, with special approval from the Finnish company. *Id.* 77:5-14. The Finnish company licenses to the Controls Group the rights to sell the same technology outside of the United States and Canada. *Id.* 77:12-22.

- The information that Baker emailed to his personal AOL email account includes patented enhancements developed by Pine. *Id.* 77:23-78:1. The patent protects a competitor from using a drawing to produce a copy of the patented product. *Id.* 78:14-16.

- Hines did not recall whether he has hired employees who have worked for Pine's competitors, but he does not have a policy regarding same, and believes that Pine can hire employees who have worked for competitors without violating any law or trade secret issues. *Id.* 79:7-19. Baker, for example, worked for Applied Test Systems ("ATS") prior to working at Pine, and had been given access as an ATS employee to certain technology and business methods. *Id.* 79:20-25. Hines did not believe that Baker violated any law with respect to ATS in the work that Baker had done for Pine. *Id.* 80:1-3.

- Baker worked for Pine in sales and customer service. *Id.* 80:8-10. Baker did not have any expertise, experience, or responsibilities in research and development. *Id.* 80:11-13. He did some purchasing of products that Pine would resell. *Id.* 80:14-18.

- Hines agreed that Pine's vendors supply other equipment manufacturers, that the vendors are not a secret, and that they are not Pine's exclusive suppliers. *Id.* 80:24-81:15.

- Pine also does not have exclusive contracts with its customers, which explains why Pine must make good products. *Id.* 81:19-24.

- Pine shares some document manuals with customers who would like to service their own equipment. *Id.* 82:10-20. Pine neither binds customers from sharing this information with others nor makes them sign an agreement to that effect, although Hines understood that Pine can require the same. *Id.* 83:3-9. Hines believes that these service instruction documents are a minority of the documents that Baker emailed to himself. *Id.* 83:10-15.
- On re-direct examination, Hines testified that he first understood that Baker would be working for Controls USA on January 10, 2014, and that Baker would be attending a trade show in Las Vegas as a representative of Controls USA. *Id.* 83:21-84:5.
- Pine Exhibit 15 contains the list of contacts in the form of labels formatted for printing that Baker had emailed to his personal AOL email account. *Id.* 84:11-15. At the trade show, Baker had handed out mass mailers, for example, Pine Exhibit 8. *Id.* 84:19-85-14.
- Hines was sure that Controls USA had been at the trade show. *Id.* 86:16-21.

### E. Factual Findings Concerning Mr. Alvaro Belena[9]

- Belena was fairly articulate, but not entirely credible.[10]
- He is the Secretary, Vice President, and regional sales and marketing manager of Controls USA, and testified on behalf of same. *Id.* 88:21:89-1, 89:15-17. He has worked for Controls for 21 years, starting in the Spanish branch, and taking on additional responsibilities in Latin America. *Id.* 89:5-14. During the past two years, he has been working on the project in the United States and Canada. *Id.* 89:5-14.
- Controls USA is a wholly-owned subsidiary of Controls s.r.l., which is based in Milan, Italy. *Id.* 89:24-90:5. The Controls Group refers to Controls s.r.l. and all of its subsidiaries. *Id.* 90:10-12. The Controls Group was founded by Mr. Geramelli 45 years ago in Italy, with a focus on an international approach, which has helped it become the largest manufacturer of testing equipment for the construction industry. *Id.* 90:13-20.
- The Controls Group has three different business units: (1) concrete and cement, (2) soil mechanical and rock mechanics, and (3) asphalt and pavement testing. *Id.* 90:21-25. Their most important products are compression machines in concrete and cement, which is the Controls Group's traditional core business and accounts for 50% of turnover. *Id.* 91:1-9. Soil mechanical and rock mechanics products comprise 30% of the business, and asphalt and pavement testing comprising the balance of about 20%. *Id.* 91:17-24.
- Belena knows that Pine manufactures a gyratory compactor, based upon his review of Pine's website, but he does not consider Pine to be a competitor concerning the gyratory compactor because it is not a key product for the Controls Group, comprising only about 2% of revenues. *Id.* 91:25-92:22. As the gyratory compactor is now also manufactured by several companies in China, it is becoming a low-cost product. *Id.* 92:12-22.

---

[9]     Belena testified with the assistance of an interpreter, as English is not his first language. *See* Evidentiary Hearing Tr. 87:15-88:1 (Feb. 24, 2014).

[10]    For example, the Court expresses its doubts whether Belena has knowledge of the content of every email or communication exchanged between Baker and Controls USA's consultant, Varlamoff, *see* Evidentiary Hearing Tr. 145:7-17 (Feb. 24, 2014), or any communications that may have occurred between Baker and Controls USA's clerical assistant, Kelly Ware, *id.* 143:8-21. The Court also expresses doubt concerning Belena's testimony concerning distributors of the Controls Group within the Western District of Pennsylvania, *see* Note 14, *infra*, and concerning his communications with Baker prior to October, 2013, *see* text accompanying Note 11, *infra*.

- The gyratory compactor was invented in France in the 1960s, and the Controls Group makes a pneumatic gyratory compactor because the pneumatic version can be lighter and smaller, and thus more mobile. *Id.* 92:23-93:20. The Controls Group has two models, the standard model, which is used only to compact material, and the research model, which is able to measure sheer strength. *Id.* 94:2-11. The last time the Controls Group restyled its gyratory compactor was in 2010, when the Controls Group updated its standard model to incorporate a microprocessor with a task screen display that allows an operator to control the machine without a separate computer. *Id.*

- Belena does not believe that the gyratory compactor has growth potential, and Controls USA does not have the gyratory compactor within its marketing business plan, but it will offer the same, if requested by the customer. *Id.* 95:25-96:16. Controls USA has no active intent to sell the gyratory compactor in the U.S. market, and does no research and development on the same at the Controls Group or within Controls USA. *Id.* 96:14-22.

- The RAM Kit is the same product that the Controls Group manufactures in Italy because both Controls and Pine acquired the same technology from Ivelop in Finland. *Id.* 97:9-19. Controls does not intend to sell the same in the U.S. because its licensing agreement prohibits sales within the U.S. and Canada. *Id.* 97:20-98:1. Belena has no interest in learning Pine's directions for manufacturing the gyratory compactor. *Id.* 98:2-4.

- Controls USA Exhibit 1 describes accessories to products of the Controls Group. *Id.* 98:5-17. One accessory is identified as ILS calibration equipment, which is a product sold by the Controls Group that uses the same technology as Pine's RAM product. *Id.*

- Service documents for Pine's gyratory compactor would not be useful to Controls USA because Controls USA does not intend to service machines other than the ones made by the Controls Group; servicing competitors' gyratory compactors is neither part of Controls USA's current policy nor an anticipated plan for the future. *Id.* 99:19-100:1. Pine's Product drawings would not be of interest because the Controls Group has its own gyratory compactor, which it believes is superior to that of Pine. *Id.* 100:15-20.

- Turning to the NCAT asphalt ignition oven, Controls USA would not purchase it from suppliers because it manufactures its own asphalt ignition oven. *Id.* 100:21-101:2.

- As for pricing information, Controls has the prices of Thermo Fisher Scientific, and does not need to acquire the pricing of Thermo Fisher Scientific through Pine. *Id.* 101:3-6.

- Prior to forming Controls USA, Controls had not been present in the U.S., but it had been working through distributors or customers. *Id.* 101:10-16. The Controls Group had been receiving 30 to 50 inquiries per week on its website from U.S. customers. *Id.* 101:17-23. Controls recently looked into opening a U.S. affiliate because its market research indicated that there were some niche markets in which Controls could succeed, such as with automatic concrete compression machines. *Id.* 102:16-103:16. U.S. competitors have maintained the same technology for four years, and one competitor launched the first automatic compression machine in the U.S. only a few months ago. *Id.* 103:2-19.

- Controls USA is now formed in the U.S., with one clerical person in Atlanta, Ware, one suspended employee, Baker, and two directors, Galli and Belena. *Id.* 103:20-104:3. Controls USA also has a six-month contract with the consultant Varlamoff. *Id.* 147:9-15.

- Controls USA Exhibit 2 is an email that Baker sent to Galli in August 2012, proposing that he work with the Controls Group in the U.S. *Id.* 105:8-14, 106:1-2. Baker references a trade show in Charlotte, NC, which had occurred in March 2012, at which time Controls USA had not yet been planned. *Id.* 106:3-12.

- Later in 2012, Galli and Belena met with Baker at the Cleveland airport, to understand Baker's skills, and consider him as a possible hire in the event that the Controls Group started something in the United States. *Id.* 107:9-15. The parties did not talk about Pine or Pine's gyratory compactor at that meeting. *Id.* 107:16-22. At the time, the Controls Group was not planning a U.S. affiliate, but had been analyzing what it would do. *Id.* 107:9-10. After the meeting in Cleveland, Baker sent additional emails to Belena and Galli, but for many months, Belena did not contact Baker. *Id.* 108:9-14.

- Mackey is not a consultant, but the owner of a company in Brazil who collaborates with the Controls Group on projects not relevant to Controls USA. *Id.* 107:23-108:8.

- In February 2013, Belena met with Baker again in Pittsburgh. *Id.* 108:17-111:1. Belena had been in the United States to meet with clients in Detroit, and had scheduled a meeting with a commercial manager of ATS,[11] to discuss pricing and a discount for BBR, a product on which the Controls Group had received inquiries. *Id.* 108:21-109:9. ATS sells to everyone in the United States. *Id.* 110:11-15. At the meeting, Belena reached an agreement with ATS for a new price policy for the Controls Group. *Id.* 110:1-15.

- At the same time, Belena contacted Baker to have a second meeting and determine if Baker would be interested in moving to Atlanta. *Id.* 109:5-9. The Controls Group was now considering a U.S. affiliate based in Atlanta. *Id.* 109:10-15. At the meeting, Belena did not talk with Baker about Pine, ask Baker to provide any information about Pine, or receive anything from Baker about Pine. *Id.* 109:16-22.

- Baker's proposed role was to provide for the service of products, as Baker did not have the skills that Controls USA was looking for in a sales manager. *Id.* 111:4-19.

- Belena also testified that he was not involved in conversations with Baker until October 2013, as Galli was dealing with Baker over the course of the negotiations. *Id.* 111:20-112:1. No one else at the Controls Group or Controls USA was involved. *Id.* 112:2-7.

- Baker's prior work experience with Pine was not something negative, but it was also important that Baker had had work experience with ATS. *Id.* 112:8-11.

- Controls USA made its employment offer to Baker in October 2013. *Id.* 112:12-13. Baker's title would be a procurement and customer care manager, which would require him to purchase parts from local suppliers and address any problems that clients may have concerning the Controls Group machines, such as delivery times and maintaining a good reputation. *Id.* 112:25-113:20. One condition of the offer was for Baker to relocate to Atlanta. *Id.* 114:1-3. Baker was also given the goal of establishing an efficient service network in the territory, which meant that Baker would enter into agreements with other companies to provide for the servicing of Controls machines, which was necessary because of the large size of the territory in the United States and Canada. *Id.* 114:12-22. These service agreements would involve training on Controls products. *Id.* 114:17-22.

- Controls USA Exhibit 3 contains Baker's Controls USA job description. *Id.* 115:5-11. The employment offer did not require him to bring any Pine information with him, and there was no side agreement to do so. *Id.* 114:23-115:4. Belena believed that Baker's experience at Pine was more related to customer care than to sales. *Id.* 115:18-21.

- In November 2013, Baker, Galli, and Varlamoff had an in-person meeting in Atlanta. *Id.* 116:18-117:9. Baker had also been in contact with Varlamoff to arrange the trip to Las Vegas. *Id.* 117:13-118:2. Controls USA did not have contact with Baker between

---

[11] As previously discussed, Baker was employed with ATS prior to his employment with Pine.

November and the end of December 2013, because Controls USA had been awaiting communication from Baker that he had resigned from Pine, and Baker had still been negotiating health insurance with Controls USA at that time. *Id.* 118:3-19. Belena also affirmed that Controls USA did not have an engineering consultant. *Id.* 118:20-119:4.

- Belena reiterated that he had never asked or suggested that Baker send any Pine-related information or provide any Pine documents to anyone within Controls USA, the Controls Group, or their consultants. *Id.* 119:8-120:14. Baker never suggested to Belena that Baker would send any Pine-related information to himself. *Id.* It was a big surprise to Controls USA when Baker was served with the present lawsuit. *Id.* 120:15.

- In early January, 2014,[12] Baker started working for Controls USA and traveled to Italy for training on products produced by the Controls Group. *Id.* 120:16-21.

- Belena was involved with Pine Exhibit 8, a marketing tool that Controls USA had prepared for the World of Concrete trade show, which invited clients to visit the Controls USA booth. *Id.* 121:8-24. The database of contacts came from work completed during the 2013 summer as they established the company. *Id.* 121:25-122:11. The clerical person in Atlanta, Ware, collected the names that Controls USA had in its database and created the contact list of approximately 1,500 to 2,000 names. *Id.* 122:2-11, 148:10-16. Belena has no reason to believe that Baker had any contact with Ware. *Id.* 122:17-20.

- The World of Concrete trade show did not focus on asphalt. *Id.* 122:21-23.

- Belena did not ask Baker for a contact list to use for the mailer, and is not aware of anyone else at Controls USA who would have asked for same. *Id.* 122:24-123:3.

- Baker was served with the Complaint at the World of Concrete trade show. *Id.* 123:10-20. Belena asked Baker (1) about the Complaint, and (2) whether Baker had actually transferred any information to himself. *Id.* As Baker responded that he had not done so, Belena informed Baker that he had no cause for worry. *Id.* 123:13-23.

- The service of the Complaint was the first time Belena had heard anything regarding Pine documents. *Id.* 123:24-124:2. After learning of the Complaint, Galli and Belena first blocked access to Baker's corporate email address. *Id.* 124:3-9. The next day, they suspended Baker until Controls USA could learn more information. *Id.* Controls USA then stopped all communication with Baker. *Id.* 124:10-15. Its lawyers communicated the suspension to Baker—but Belena called Baker to explain that they would suspend him and nothing else. *Id.* They suspended him because they had to understand what was happening before they could determine whether to terminate him. *Id.* 125:2-8.

- Controls USA Exhibit 4 is a communication from Controls USA's lawyers to Baker about his suspension of employment, as authorized by Belena. *Id.* 124:16-24.

- Controls USA is a Georgia company, which never considered Pennsylvania to be a site for its business; it owns and leases no property in Pennsylvania, and does not pay any taxes in Pennsylvania. *Id.* 125:9-19. Other than Baker, Controls USA has no employees in Pennsylvania. *Id.* 125:20-25. Baker was required to move to Atlanta for his employment, and but for the present lawsuit, Baker would be in Atlanta. *Id.* 126:1-6.

- On cross examination by counsel for the Plaintiff, Belena acknowledged that he is not an officer of the Controls Group. *Id.* 127:20-23. Rather, he is the secretary of the Board of Directors of the Spain branch of the Controls Group.[13] *Id.* 127:20-128:2.

---

[12]     As previously noted, the present lawsuit was filed on January 22, 2014. (Docket No. 1).

- Belena confirmed that at no time during the meetings between him and Baker did he discuss Pine. *Id.* 128:13-18. Controls USA has not yet sold any products or services to date, but it intends to service the entire United States, with no intention to exclude products or services from Pennsylvania. *Id.* 128:19-129:7.

- ATS has been a supplier of the Bending Beam Rheometer or BBR to the Controls Group for several years. *Id.* 129:8-24. Belena knew that ATS has been supplying products to the Controls Group two or three times per year for at least four to five years. *Id.* 129:25-130:16. The Controls Group has never had a dispute with ATS. *Id.* 130:17-21.

- Varlamoff, the consultant, was hired to support Controls USA, but Controls USA did not inform Varlamoff of the hiring of Baker until the November 2013 meeting in Atlanta; the consultant was present only during that meeting. *Id.* 130:22-131:13.

- Baker would have communicated with Varlamoff to prepare for the World of Concrete trade show. *Id.* 131:14-17. All parties should have copied Belena on communications regarding Controls USA, *id.* 131:18-132:9, but there were some communications between Baker and Varlamoff on which Belena had not been copied. *Id.* 132:7-9.

- Galli has been and remains in charge of Controls USA and the launch of same, as he is the president of same. *Id.* 132:9-19. Belena is directly below Galli. *Id.* 132:20-21.

- The asphalt and pavement group is the smallest of the three divisions of the Controls Group. *Id.* 132:22-133:3. There is some overlap, as some employees work in all three divisions, and there are product managers for each business unit. *Id.* 133:4-12.

- Controls USA Exhibit 1 indicates on the last page that the apparatus is supplied complete with PC software, connecting cable, distance plate, steel plate, one pair of loading rings, and a carrying box. *Id.* 134:8-13. Belena was unaware that Pine eliminated the necessity of PC software for the RAM kit or any significance of same. *Id.* 134:17-21.

- Controls USA Exhibit 2, the email from Baker to Galli, dated August 24, 2012, does not propose that Controls open a location in the United States. *Id.* 136:3-6. At the time that Galli had received this email, Controls had not decided anything, and had been working in the same way it had been working for several years, by using distributors in the United States. *Id.* 136:7-20. The Controls Group had not done anything regarding possible locations at that time because it had not yet decided to establish Controls USA. *Id.*

- Pine Exhibit 8, the mass-mailer, would need to be mailed out using handwritten or affixed labels, although Controls USA sent some copies out by email. *Id.* 137:20-25.

- Belena admitted the possibility that companies may require both concrete and asphalt testing equipment, and they can be the same client for the Controls Group. *Id.* 138:17-22.

- Turning to the February 2013 meeting in Pittsburgh between Belena and Baker, Controls USA had decided to establish the company in Atlanta, and had been considering Baker at that time, but the parties did not discuss anything concerning Pine. *Id.* 138:23-139:9.

- Ultimately, Controls USA communicated an offer to Baker concerning a position with Controls USA in customer service. *Id.* 139:11-18. Belena was not interested in Pine, but in Baker's skills and experience, and Belena was able to make that determination based on Baker's resume without discussing the 14 years that Baker spent at Pine. *Id.* 140:1-22.

---

[13]     According to the organizational chart provided on its website, Controls s.r.l. appears to have seven branches, which include France, Spain, the United Kingdom, Mexico, Poland, the United States, and Iraq. *See* Controls Group & Distribution Networks, *available at* http://www.controls-group.com/eng/controls-group.php.

- Belena admitted that he now knows that Baker was dishonest with Controls USA when Baker denied sending to his personal AOL information. *Id.* 141:17-25.

- On re-direct examination, Belena clarified that the relationship with ATS is with the Controls Group, and there is no agreement between Controls USA and ATS. *Id.* 142:9-17. He also confirmed with 100% certainty that Baker did not coordinate or participate in the sending of the mailing for the World of Concrete trade show. *Id.* 142:25-143:2.

- On re-cross examination, Belena admitted that a phone call could have occurred between Baker and Ware. *Id.* 143:8-21. But, Belena confirmed that no emails went from Controls USA to Baker's Controls USA email account or his personal AOL email account, and no emails went from Baker's email accounts to Controls USA. *Id.* 144:10-145:6. Belena further confirmed that he knew the content of the emails exchanged between Baker and Varlamoff despite not being copied on those emails. *Id.* 145:7-17.

- Belena clarified that the Controls Group manufactures some products in the metric system and other products in both the metric and American systems. *Id.* 145:19-23. He also confirmed that the Controls Group has no distributors in Western Pennsylvania.[14] *Id.* 145:24-146:1. Sample distributors for the Controls Group include Humboldt, based in Chicago; Innkeeper, based in Detroit; Cetec, based in Atlanta; and a fourth company, based in Columbus. *Id.* 146:3-16. But, Cetec is the main distributor. *Id.* 146:10-16.

- Varlamoff, the consultant, has been living in Atlanta for the past 20 years. *Id.* 146:18-22. As for his background and experience, he was a sales manager for several years for a company in Atlanta called Duhralgeo. *Id.* 146:23-147:4. Controls USA has a six-month contract with Varlamoff, starting in October or November of 2013. *Id.* 147:9-15.

- Belena did not take any notes from any of his meetings with Baker, but Galli may have taken notes. *Id.* 147:16-148:9. No one took notes during the second meeting in Pittsburgh, as it occurred over dinner. *Id.* 148:4-9.

- The clerical assistant, Kelly Ware, is still employed by Controls USA. *Id.* 148:10-16.

- Baker and Varlamoff were instructed to copy Belena on all communications regarding Controls USA because they were starting a new company. *Id.* 148:17-24.

- Belena was present at the World of Concrete trade show in Las Vegas. *Id.* 148:25-149:6. Baker and Varlamoff were both present as well. *Id.*

### F.     Factual Findings Concerning Mr. Flavio Galli

- Galli did not appear before the Court, except by affidavit, which the Court found to be insufficient to evaluate Galli's credibility, particularly when the Court had previously notified counsel for all parties on February 19, 2014 that an affidavit would not be sufficient in lieu of in-person testimony. *See* Evidentiary Hearing Tr. 135:4-8 (Feb. 19, 2014) ("If we're going to have a hearing, then I'm going to need to hear from Hines and I'm going to have to hear from whoever it is at Controls USA and what they were up to. Affidavits are not enough. Credibility is always an issue.").

---

[14]     The Court notes that the Controls Group North America website reports several distributors within Pennsylvania, including Broudy Precision (Philadelphia), Edward C. Smyers Company (Pittsburgh), Meier Supply Company (Allentown, Altoona, East Stroudsburg, Erie, Hanover, Harrisburg, Scranton, and Wilkes–Barre), and Universal Supply Group, Inc. (Willow Grove). *See* Controls Group North America, Together We Accomplish More: Find a Distributor in Your Area, *available at* http://www.cgnacontrols.net/Directory.aspx?cType=Distributor&State=PA.

- At the February 24, 2014 evidentiary hearing, counsel for Controls USA did not provide any medical records on Galli, *see* Evidentiary Hearing Tr. 149:20-150:8 (Feb. 24, 2014), but subsequently provided the records via fax,[15] *see id.* 162:22-163:2, after the hearing.

### G.    Factual Findings Concerning Mr. Ivan Varlamoff

- Varlamoff did not appear before the Court.  As such, the Court cannot determine his role nor his credibility.

### H.    Factual Findings Concerning Ms. Kelly Ware

- Ware did not appear before the Court.  As such, the Court cannot determine her role nor her credibility.

### I.    Factual Findings Concerning Pine's Exhibits[16]

- Pine Exhibit 1 is an Employee Receipt Acknowledgement form that was signed by Gordon Baker with a date of September 19, 2006.  This acknowledgement states that Baker understands that his employment with Pine is at will, and that either Pine or Baker can terminate his employment with Pine "at any time for any reason."
- Pine Exhibit 2 appears to be an excerpt from the Pine Employee Handbook concerning Confidentiality, with a revision date of April 2013.  The excerpt indicates that employees "may learn or acquire confidential, secret, and proprietary information that is to be used solely in the interest of Pine and is not for external distribution."  This information "must not be used for individual benefit."  The excerpt also indicates that clients and other parties with whom Pine does business entrust Pine with information that is to be considered confidential and not to be disclosed to external parties.
- Pine Exhibit 3 is a signature sheet with a caption, entitled: "Mandatory employee meetings held in the Lower Level Conference Room at 101 Industrial on Tuesday, October 22, 2013.  Baker's signature appears second on the list of signatures.
- Pine Exhibit 4 is a two-page electronic mail letter, also stamped Exhibit 1, dated November 4, 2013, from Controls USA Directors to Gordon Baker.  The letter indicates that Controls USA had made an offer of employment to Gordon Baker, which Baker accepted on October 23, 2013.  It also sets forth Baker's position as a "Procurement & Customer Care Manager," with a start date of January 2014, in the Metro Atlanta Area.  On the second page, it sets forth criteria for paying Baker a bonus within 60 days of the last day of each fiscal year and a special bonus for the first complete fiscal year (2014).
- Pine Exhibit 5 is a copy of the seven-page Affidavit of Gordon Baker, also filed of record at Docket No. 25-1 on February 14, 2014.
- Pine Exhibit 6 is a fourteen-page document containing a series of thirteen emails sent from Baker's Pine email account to his personal AOL email account, which has been

---

[15]     On February 26, 2014, the Court received via fax Galli's medical records in Italian.  Counsel for Controls USA also provided an informal translation by Controls USA, which indicated that he had suffered a heart attack on February 22, 2014, and was hospitalized at the Coronary Care Unit of the San Gerardo Hospital in Monza, Italy.

[16]     As previously noted, Pine Exhibits 1-5, 6A, and 7-15 were admitted in evidence without objection.  *See* Evidentiary Hearing Tr. 49:9-21 (Feb. 24, 2014).

redacted and re-admitted in evidence as Pine Exhibit 6A. The emails contained within this Exhibit are discussed in detail within the factual findings for Gordon Baker. *See supra* § III.A.

- Pine Exhibit 7 is a fifteen-page Summary Exhibit, titled "Rule 1006 Summary of Gordon Baker Email Activity," containing a list of emails and their attachments, sorted by date. This Exhibit is also discussed extensively within the factual findings for Gordon Baker. *See supra* § III.A.

- Pine Exhibit 8 is a photocopy of a "Mass Mailer," titled "Controls USA: Your Partners in Technology; Global Leader in Testing Equipment for Civil Construction, now offering local service and expertise in North America." The Exhibit appears to contain a rectangular space where a mailing label can be affixed.

- Pine Exhibit 9 is a letter from Robin J. Vaughn, HR Manager, Pine Instr. Co., to Gordon Baker, dated December 29, 2013, confirming Baker's resignation date of Friday, January 3, 2014. The letter provides a summary of his final paycheck, his insurance and benefits, and his 401K account. It also requests the return of any Pine Property, that is, his "key fob."

- Pine Exhibit 10 is a copy of Gregory M. Cancilla's curriculum vitae, spanning five pages. As noted, he was proffered by Pine to testify concerning Pine's proposed forensic examination protocol of Baker and Control USA's electronic devices and email accounts.

- Pine Exhibit 11 is a sealed exhibit containing drawings of Pine's G2 Gyratory Compactor Assembly.

- Pine Exhibit 12 is a sealed exhibit containing a Bill of Materials for the GC RAM Kit.

- Pine Exhibit 13 is a sealed exhibit containing exploded drawings of the assembly process and components of the RAM Kit.

- Pine Exhibit 14 is a five page document, titled "Rule 1006 Summary of Attachment to October 25, 2013 Email, Subject Line MISC 1." This Exhibit contains what appears to be a summary of attachment MMM to Baker's October 25, 2013 email with the subject line MISC 1.

- Pine Exhibit 15 is a sealed exhibit binder containing a spreadsheet of Pine's contact information database. The Court has conducted a preliminary comparison of Pine Exhibit 15 with the contact list provided by Controls USA, but at this point, the Court does not find that the Controls USA contact list is necessarily derived from Pine's contact list contained within Pine Exhibit 15.

### J.    Factual Findings Concerning Controls USA's Exhibits[17]

- Controls USA Exhibit 1 is a four-page document titled "Gyrocomp: The third generation of gyratory compactors for demanding high productivity laboratories," issued by Controls. The Exhibit appears to describe the features of Controls s.r.l.'s gyratory compactor. On page 4 of the Exhibit, there is a description of ILS calibration equipment, which seems to be "supplied complete with PC software, connecting cable, distance plate, steel plate, one pair of loading rings, [sic] carrying box."

---

[17]     Controls USA Exhibits 1-4 were also admitted in evidence without objection. *See* Evidentiary Hearing Tr. 150:15-20 (Feb. 24, 2014).

- Controls USA Exhibit 2 is an email from Gordon Baker to Flavio Galli with subject line Employment Consideration, dated August 24, 2012. This Exhibit is discussed in more detail within the factual findings for Gordon Baker. *See supra* § III.A.
- Controls USA Exhibit 3 is a two-page document on Controls letterhead, containing a Job Description for the Position entitled "Procurement / Service Manager of Controls USA." The Job Description provides a summary of the purpose and duties of the Procurement and Service Manager of Controls USA. These duties include, among others, managing and controlling suppliers, establishing new strategic relationships with key suppliers, identifying new suppliers, negotiating supply agreements, obtaining products and services, working with suppliers, maintaining accurate records, accomplishing customer service resource objectives, achieving customer service objectives, determining customer service requirements, investigating and solving customers' problems which may be complex or long-standing, and learning about Controls' products and services.
- Controls USA Exhibit 4 is two-page letter (delivered via email) to Gordon Baker from Eileen H. Rumfelt, with the subject line *Pine Instruments, et al. v. Controls USA, Inc. and Gordon Baker*, Civil Action No. 2:14-cv-94 (Western District of Pennsylvania). In the letter, Controls USA states that it is suspending Gordon Baker. It also states that during his suspension, Baker is not to perform any activities on behalf of Controls USA, and is no longer required to relocate to the Atlanta area.

## IV. DISCUSSION

At the outset, the Court notes that the Third Circuit has recognized in several cases the potential need for expedited discovery to evaluate the factors required for a preliminary injunction. *Shields v. Zuccarini*, 254 F.3d 476, 480-81 (3d Cir. 2001) ("After affording the parties a brief time for expedited discovery, the court held a hearing on Shields's request for injunctive relief. On March 22, 2000, the court entered a preliminary injunction in favor of Shields."); *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1425 (3d Cir. 1994) ("After expedited discovery, full briefing, and the submission of detailed affidavits, the district court held a hearing on AT&T's application [for a preliminary injunction], between March 1 and March 11, 1994."); *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 809 (3d Cir. 1989) ("After the parties had engaged in expedited discovery, the district court held an evidentiary hearing on March 17, 1989."); *CNW Corp. v. Japonica Partners, L.P.*, 874 F.2d 193, 197 (3d Cir. 1989) ("On April 14, after an expedited briefing and discovery schedule, the district

court denied CNW its preliminary injunction and refused injunctive relief pending appeal."); *Polaroid Corp. v. Disney*, 862 F.2d 987, 991 (3d Cir. 1988) ("After expedited discovery and a hearing, the district court, for reasons set forth below, denied Polaroid's motion for a preliminary injunction."); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1245 (3d Cir. 1983) ("After expedited discovery, Apple moved for a preliminary injunction to restrain Franklin from using, copying, selling, or infringing Apple's copyrights. The district court held a three day evidentiary hearing limited to the copyright infringement claims.").

Here, Pine has presented sufficient evidence to warrant expedited discovery to determine whether a preliminary injunction should be granted. As the Court has previously noted in its factual findings, Baker sent numerous emails to himself containing confidential and proprietary Pine information and trade secrets, despite having accepted employment with Controls USA, and prior to notifying Pine of his intent to leave Pine. Moreover, Controls USA failed to produce testimony from the President of Controls USA, Galli, the consultant, Varlamoff, or the clerical assistant, Ware, concerning any communications that may have occurred between and among Galli, Varlamoff, Ware, and Baker. *See United States v. Walker Co.*, 152 F.2d 612, 613 (3d Cir. 1945) ("It is a general principle that failure to produce evidence or present witnesses available to a party gives rise to the inference that such evidence or testimony would be unfavorable to that party."). The Court of course recognizes that an "adverse negative inference is an extreme remedy," *McAdams v. United States*, 297 F. App'x 183, 187 (3d Cir. 2008), and that Controls USA has provided the medical records of Galli to explain his failure to appear based on a medical emergency, but it has provided no explanation as to why it has not produced Varlamoff or Ware, who may have information and evidence pertinent to this case, even though both appear to be in its control.

For these reasons, the Court will hold Pine's Amended Motion for a Preliminary Injunction, (Docket No. 14), in abeyance pending the results of the expedited discovery.

V.    **CONCLUSION**

Based on the foregoing,

IT IS HEREBY ORDERED that Defendant Controls USA's Oral Motion for Expedited Discovery is GRANTED. Defendant Baker shall submit all of his electronic devices to Plaintiff for a forensic examination, with the costs of initial testing and examination of his devices to be borne by Baker, as the Court finds that Baker is willing to have his devices forensically examined, and the Court did not find him to be entirely credible as to his alleged use of the subject electronic data. Following the initial forensic examination, Baker may seek reallocation of costs by way of a Motion, supporting brief, and proposed Court Order.

IT IS FURTHER ORDERED that the parties shall meet and confer and file a joint discovery plan including a proposed forensic examination protocol for any remaining electronic devices or email accounts that may be at issue by no later than **April 15, 2014 at 12:00 PM**. To the extent that the parties cannot reach agreement concerning the forensic examination of electronic devices or email accounts of Controls USA Directors, employees, or consultants, or the Controls s.r.l. employees who work on asphalt projects, the Court will appoint an e-discovery special master, with the costs to be allocated in three equal portions between Pine, Controls USA, and Baker.

IT IS FURTHER ORDERED that Pine's Amended Motion for a Preliminary Injunction [14] shall be held in abeyance pending the results of the forensic examinations and discovery between April 15 and July 15, 2014.

IT IS FINALLY ORDERED that additional electronic discovery may be ordered in this case following the results of the initial electronic discovery, once the Court receives the parties' proposal as outlined above.

_s/ Nora Barry Fischer_
Nora Barry Fischer
U.S. District Judge

Date:   April 1, 2014
cc/ecf: All counsel of record.